IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Rosella Rowell, | ) | C/A No. 3:09-3077-MBS-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Palmetto Health Alliance, *a/k/a Palmetto Health*, | ) | |
| | ) | |
| Defendant. | ) | |

The plaintiff, Rosella Rowell ("Rowell"), filed this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq. ("Title VII"), against the defendant, Palmetto Health Alliance ("Palmetto Health"). This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) DSC for a Report and Recommendation on the defendant's motion for summary judgment. (ECF No. 23.) Rowell filed a response in opposition (ECF No. 27) and the defendant replied (ECF No. 28). Having reviewed the parties' submissions and the applicable law, the court finds that the defendant's motion should be granted.

**BACKGROUND**

This matter arises out of Rowell's employment as a Medical Technologist III in the hematology section of Palmetto Health's Laboratory Services Department from January 18 to May 14 of 2008. Rowell claims that during the four months between her hiring and firing, she was harassed by her co-workers, who were also responsible for her training, because she is Filipino. Rowell's hostile work environment claim rests on the theory that her co-workers—whom she characterizes as "white, Southern women"—set her up for failure through inadequate training,

causing her to lose her job for the stated reason of poor performance. She also alleges that she was yelled at and bullied by her trainers. Rowell further claims that Palmetto Health retaliated against her by terminating her after she expressed her intention to file a harassment complaint.

The conduct of the following individuals is at issue with regard to Rowell's claims:

| | |
|---|---|
| Leigh Stowe | Co-workers and trainers in the hematology section who Rowell alleges mistreated her and inadequately trained her. The allegations of harassment are chiefly raised against Stowe. |
| Sylvia Singletary | |
| Sandy White | |
| Lila Cartledge | |
| Christy Knight | Laboratory Services Department Manager, who was the supervisor of Rowell and her trainers. |
| Mary Sue Sawyer | Director of Laboratory Services Department. |

Before outlining the relevant details necessary to resolution of the defendant's motion, the court observes that much of the facts recited in Rowell's memorandum in opposition to summary judgment are wholly unsupported by admissible evidence. Rather, Rowell relies on her interrogatory responses, which are not verified or signed by the plaintiff, but rather by plaintiff's counsel. In many cases, the facts as related therein appear to be at variance with the plaintiff's deposition testimony. As such, they cannot defeat a properly supported motion for summary judgment. See Fed. Rule Civ. P. 56(e). Although Rule 56(c)(1)(A) permits a party to use interrogatory answers to show that a fact cannot be or is genuinely disputed, the remainder of the Rule makes clear that a party must be able to support its assertions of fact with admissible evidence. See generally Fed. R. Civ. P. 56. The Rule does not contemplate that a party may defeat summary judgment by asserting facts supported only by interrogatory answers drafted by counsel that are wholly unsupported by any admissible

evidence. Accordingly, the court considers following facts, which are either undisputed or taken in the light most favorable to Rowell, to the extent they are supported by the record.

As a newly hired Medical Technologist III working the day shift, Rowell received general orientation, then began training with regard to the procedures and systems used during the day shift. Her co-workers and trainers were responsible for ensuring that new trainees like Rowell became proficient in performing discrete laboratory procedures before permitting them to perform such tests on their own. Before performing such procedures independently, a trainee had to be "checked off" as competent and comfortable with that procedure. Although Rowell had served as a medical technologist previously in Virginia, because hospital procedures and equipment vary, Rowell required training specific to Palmetto Health. During Rowell's training period, other newly hired medical technologists who were not assigned to the day shift were also receiving their training by other trainers on different shifts.

Approximately a week after Rowell began her training, some of the trainers asked Rowell where she was from. She replied that she was from the Phillipines. Both Stowe and Singletary expressed a reaction to this information on their faces by giving Rowell "a look." (Rowell Dep. at 103:9-104:10, ECF No. 23-2 at 27.) According to Rowell, after that Stowe's voice was different when she talked to Rowell. The trainers became hostile to her and would not give her the information she perceived that she needed, even though other trainees were receiving additional training that Rowell was not. Several months later, during a conversation in which Rowell asked Stowe why Rowell was not receiving the same type of training as the other newly hired technologists, Stowe made the comment, "You're not one of us." Another trainee testified that the



trainers called Rowell "Yankee" behind her back.[1] They treated Rowell "like a second-class citizen" and spoke condescendingly to her. On one occasion, Stowe told Rowell to repeat a procedure because Rowell had not done it the way Stowe performed the test. Contrarily, Singletary told Rowell her performance was correct. After Singletary and Stowe conversed, Stowe conceded that Rowell's method was also correct. Additionally, Singletary forced Rowell to perform a test for which Rowell had not been "checked off." Rowell was then criticized for not performing the test properly.

Rowell discussed this perceived hostility during a scheduled meeting with her supervisor, Christy Knight, approximately thirty days after her start date. When Rowell expressed her frustrations about the adequacy of her training, Knight advised Rowell to "just be patient." (Rowell Dep. at 107:21-108:1, ECF No. 23-2 at 28.) By the beginning of April, Knight had begun to have concerns about Rowell's performance. Knight requested Rowell's trainers to make written notes regarding Rowell. This was allegedly done to assist Knight in preparing an improvement plan for Rowell. The improvement plan was issued on April 21. The notes from her co-workers observed, among other things, that Rowell became argumentative if she did not agree with a procedure, did not take control of her mistakes and blamed her mistakes on improper training, and did not always ask for help. One co-worker noted that Rowell "tries to be helpful but it turns into not doing her [own

---

[1] For the edification of any readers from outside the Fourth, Fifth, and Eleventh Circuits, some residents of the American South use the term "Yankee" to refer to those from the Northeastern United States. The term can, but does not necessarily, have a negative connotation. While the court recognizes that the term "Yankee" can have several meanings, it is unaware of any use of the term to refer to individuals originating from the Phillipines. Nor is the court aware of any authority supporting the notion that Northerners are a protected class under Title VII. Accordingly, the court finds, even assuming that Rowell was aware that she was being covertly referred to as a Yankee, that this fact is of no probative value in the determination of whether she suffered a hostile work environment made unlawful by Title VII. Her assertion that another Palmetto Health employee felt excluded from this group of technologists in the hematology department because he was from the North is similarly unsupportive.



tasks] and creating problems for co-workers."  Notably, Stowe's notes reflected that by the middle of April Rowell's attitude was "getting more positive."  (See Co-worker's Notes, ECF No. 27-8 at 25-30.)

On April 18 Rowell again complained to Knight about Stowe's treatment of her.  This complaint apparently arose from an incident in which Stowe accused Rowell of moving a water bottle in the laboratory which had actually been moved by Sandy White.  White affirmed to Stowe that she, rather than Rowell, had moved the bottle.  It appears that when Rowell complained to Knight about Stowe's accusation, Knight counseled Stowe and required that Stowe apologize to Rowell.  Although the record is far from clear, it appears that Rowell claims that during her discussion of this incident with Knight, Rowell informed Knight that she wanted to file a formal workplace harassment complaint against Stowe.  Knight allegedly discouraged her from doing so because she did not want to discredit the trainers.  (Rowell Dep. at 290:7-10, ECF No. 23-2 at 74.)  The record contains an email dated that same day, in which Knight informed Sawyer that Singletary had mentioned that Rowell had complained to Singletary that Stowe was harassing her.  The e-mail expressly states that Knight had not spoken with Rowell about it, and inquires whether she should have a human resources employee review the issue.  (ECF No. 27-8 at 7.)  After Rowell complained to Knight at the April 18 meeting, Knight spoke with the trainers, but, according to Rowell, any improvement in the training she received thereafter was sporadic and the hostility actually increased.

Three days after this meeting, Knight and Sawyer met with Rowell on April 21 and provided her with a Disciplinary Action Report, issuing "constructive advice"[2] regarding an infraction of Palmetto Health's standards of behavior and implementing a Performance Improvement Plan.  The

---

[2] At Palmetto Health, constructive advice is less serious than a written reprimand.



next day, Rowell met with Knight again and told Knight that she perceived the improvement plan to be unfair and inaccurate. The next week, Knight denied Rowell's request to be moved to the second shift.

During this time frame, Stowe was also issued an improvement plan, at least part of which stemmed from Rowell's complaints about her. Specifically, Stowe was instructed to improve her communication and interpersonal skills. White and Cartledge also received improvement plans directing them to improve their communication skills and interactions with co-workers.

On May 5, Rowell contacted Palmetto Health's human resources department and was informed she could file a rebuttal statement with regard to her disciplinary action report and performance improvement plan. Rowell did so, detailing how her training and performance had been negatively affected by the hostility and unhelpfulness of Stowe. Rowell denied that her performance had been unsatisfactory and attributed her perceived mistakes to inadequate training, pointing out the differences between her training and that received by other new trainees. Rowell provided the rebuttal letter to Knight on May 6. That same day, Knight issued Rowell a second Disciplinary Action Report and a written warning for unsatisfactory work performance. The report cited three specific events where Rowell had made mistakes in performing procedures. Rowell had not been previously counseled regarding these alleged mistakes prior to receiving the written warning. Sawyer noted on the report that the next occurrence could result in suspension or termination.

On May 14, Knight again met with Rowell regarding her performance.[3] According to Rowell, she told Knight that she wanted to file a formal complaint against Stowe. Knight then took her to speak with Sawyer. Rowell reiterated her statement to Sawyer, who replied that she didn't want Rowell to file a formal complaint of discrimination. (Rowell Dep. at 290-93, ECF No. 23-2 at 74-75.)

Rowell was called in to meet with Sawyer and Knight again that afternoon, and Sawyer informed Rowell that she was being terminated. She issued Rowell a third disciplinary report stating that Rowell was discharged. Rowell contends that Sawyer gave as the reason for Rowell's termination that Rowell "did not fit in." Rowell asked if that was because she was not white like the rest of her co-workers. Sawyer then told Rowell she would not discuss it. (Rowell Dep. at 288, ECF No. 23-2 at 73.)

---

[3] In plaintiff's brief, counsel relates a version of this meeting that is wholly unsupported by any evidence in the record. According to counsel, Knight asked Rowell to withdraw her rebuttal letter. Rowell refused, and the two of them then met with Sawyer. Sawyer directed Rowell to withdraw the letter. Rowell again refused, and further stated that she wanted to file a formal complaint of harassment. Sawyer replied, "Oh no, you can't do that." Rowell proffered witnesses, and Sawyer replied, "I don't want any witnesses. I have to think." Sawyer then told Rowell she would get back to her. Neither the materials cited by the plaintiff nor the portions of Rowell's deposition that the court has been able to identify as pertaining to these events provide factual support for this specific portrayal of the meeting. See Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). Consequently, the court is disregarding it in favor of Rowell's sworn deposition testimony regarding these events. See Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact . . . the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or . . . issue any other appropriate order.").



DISCUSSION

A.  **Summary Judgment Standard**

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material fact*." Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987) (emphasis in original) (internal quotation marks & citation omitted). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. Id. at 257.

In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 645 (4th Cir. 2002). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. See id. at 148 (stating that "[c]ertainly there



will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

**B.     Burden-Shifting Framework**

A plaintiff seeking to prove an unlawful employment action may produce circumstantial evidence and proceed under the McDonnell Douglas burden-shifting framework. Warch v. Ohio Casualty Ins. Co., 435 F.3d 510, 520 (4th Cir. 2006); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Pursuant to this framework, once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action. Merritt v. Old Dominion Freight, 601 F.3d 289, 294 (4th Cir. 2010). The defendant's burden "is a burden of production, not persuasion." Reeves, 530 U.S. at 142. Once a defendant meets this burden by producing affidavits or testimony demonstrating a legitimate, nondiscriminatory reason, "the McDonnell Douglas frame-work—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*." Id. (internal quotation marks & citations omitted).

In other words, if the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason, the plaintiff must demonstrate by a preponderance of the evidence that the proffered reason was " 'not its true reason[], but [was] a pretext for discrimination.' " Merritt, 601 F.3d at 294 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). Accordingly, the plaintiff's burden of demonstrating pretext " 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.' " Merritt, 601 F.3d at 294 (quoting Burdine, 450 U.S. at 256) (alterations in original); see also Diamond v.



Colonial Life & Accident Ins. Co., 416 F.3d 310, 319 (4th Cir. 2005).  To meet this "merged" burden, the employee may prove by a preponderance of the evidence that the decision maker's affidavit is untrue or that the employer's proffered explanation is unworthy of credence.  Burdine, 450 U.S. at 256.

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves, 530 U.S. at 148.  However, "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," summary judgment is appropriate.  Id.  Accordingly, the court must evaluate "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Id. at 148-49.  "Notwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of the ultimate question of . . . whether the plaintiff was the victim of intentional discrimination." Merritt, 601 F.3d at 294-95.

**C.    Hostile Work Environment**[4]

Title VII prohibits creating or allowing a hostile work environment based on race, color, religion, sex, or national origin.  See Baqir v. Principi, 434 F.3d 733, 746 n.14 (4th Cir. 2006).  Such an environment exists "[w]hen the workplace is permeated with discriminatory intimidation,

---

[4] In her memorandum, plaintiff clarifies that she is not asserting a claim of discriminatory disparate treatment.



ridicule, and insult that is sufficiently severe or persuasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks & citations omitted).  However, "[w]orkplaces are not always harmonious locales." E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315-16 (4th Cir. 2008) (Title VII).  Moreover, federal anti-discrimination laws are not "general civility code[s]." Oncale v. Sundower Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (Title VII).

To establish a *prima facie* case of harassment under Title VII, a plaintiff must show: (1) she was harassed because of a protected characteristic; (2) the harassment was unwelcome; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment; and (4) some basis exists for imputing liability to the employer. See Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998).  To meet the causation element, a plaintiff must show that "but for" the protected characteristic, she would not have been a victim of harassment. Id.  The federal anti-discrimination statutes do not protect employees from hostility and abuse unless the objectionable conditions occur because of a protected characteristic.  See Graham v. Prince George's Cnty., 191 Fed. Appx. 202, 204 (4th Cir. 2006) (unpublished) (finding the district court did not err in determining that "although [the] facts reflected an unpleasant working environment, they did not support a hostile one based on an unlawful characteristic"); see also Oncale, 523 U.S. at 80.

Further, when analyzing the third element, courts examine the totality of the circumstances, considering such factors as the frequency of the discriminatory conduct and its severity; whether it is physically threatening or humiliating or merely constitutes offensive verbal statements; and whether it unreasonably interferes with an employee's work performance.  See Harris, 510 U.S. at

Page 11 of  20



23; Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996); see also Sunbelt Rentals, Inc., 521 F.3d at 315-16 (stating that complaints that would objectively give rise to bruised or wounded feelings or incidents that are premised on nothing more than rude treatment, callous behavior, or a routine difference of opinion and personality conflict will not satisfy the severe or pervasive standard).

Rowell cannot meet several elements of the *prima facie* case. First, she cannot show that the unwelcome treatment she received was because of her national origin. In support of the causation requirement, she asserts that her co-workers were initially nice to her but after she had been employed for approximately one week, she revealed that she was of Filipino origin. She attests that upon learning of this, Stowe and Singletary gave her "a look." (Rowell Dep. at 103:9-104:10, ECF No. 23-2 at 27.) She further contends that, weeks later, when she inquired of Stowe why she was not receiving similar training to the other trainees, Stowe answered that she was not "one of us." However, even taken in the light most favorable to plaintiff, the undisputed evidence shows that Stowe and the other trainers in hematology treated everyone who was "not one of [them]"—*i.e.*, Southern and white, as the plaintiff herself characterizes them—equally inhospitably. For example, Jason Stiles, a former supervisor in that department, testified that this group of women resisted his proposed changes when he arrived and attributed their attitudes to his status as an outsider from the North. He subsequently transferred to a different position for personal reasons, which he appears to partially ascribe to the attitudes of the women in the hematology section. (Stiles Dep. at 7:22-8:11, ECF No. 23-10 at 3.) Similarly, another new trainee who was Caucasian was also subjected to rude treatment and eventually terminated due to performance problems. (Roberts Dep. at 63:12-

64:5, ECF No. 23-9 at 17; Stiles Dep. at 74:8-75:4, ECF No. 23-10 at 20.)  Thus, the record undeniably shows that the trainers' alleged hostile behavior and exclusiveness was indiscriminate.

Moreover, even if the presumably disparaging facial expressions by Singletary and Stowe were sufficient to establish "but for" causation, the court observes that the trainers' behavior toward Rowell does not rise to the severe and pervasive standard required to state a claim for a hostile work environment.  Case law indicates that to establish a hostile work environment based upon race or national origin, a plaintiff must show that the hostility involved overtly racially offensive or insulting conduct.  See Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 190 (4th Cir. 2004) (affirming summary judgment on a hostile work environment claim where the record contained no evidence of racially offensive conduct toward the plaintiff); Causey, 162 F.3d at 799-800, 801 (finding that the causation element was not satisfied where the allegedly hostile conduct, which included interfering with the plaintiff's ability to complete projects, limiting access to the supervisor, withholding information, imposing unreasonable deadlines, and chastising the plaintiff, did not include any comments based on race and nothing about the alleged harasser's conduct suggested it was based on race).

Here, Rowell offers no evidence that she was the victim of derogatory slurs or epithets about Filipinos, or about Asians generally.  No evidence suggests she was ever physically threatened. Merely yelling at a new trainee does not rise to actionable harassment.  See Oncale, 523 U.S. at 80 (stating that federal anti-discrimination laws are not "general civility code[s]"); Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005) ("[R]udeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim.").  Rowell's hostile work environment claim rests largely on the theory that her co-workers, who also served as her trainers and were all "white,



Southern women," purposely provided her inconsistent or incorrect information in order to "set her up for failure." (Pl.'s Mem. Opp'n Summ. J. at 3, 5, ECF No. 27 at 3, 5.) As support for this theory, Rowell relies on various incidents, including being provided conflicting information regarding procedures and being required to perform a test for which she was not adequately trained or "checked off." This is the same type of conduct found to be insufficient to meet the applicable standard in Causey. Causey, 162 F.3d at 799-800, 801.

Moreover, Stowe's and Singletary's facial expressions upon hearing that Rowell, who is patently not Caucasian, was of Filipino origin, and Stowe's unrelated statement months later that Rowell was "not one of us" are too isolated and trivial to constitute harassment. See Hartsell v. Duplex Prod., Inc., 123 F.3d 766, 773-74 (4th Cir. 1997) (holding that four insensitive comments directly referencing the plaintiff's gender over a three-month period were "far from the paradigmatic case of sexual harassment"). Considering the totality of the circumstances and applying the Harris factors, only one factor even arguably weighs in favor of finding the conduct at issue severe and pervasive—Rowell's contention that the alleged harassment interfered with her work performance.[5] However, all of the other factors show that the nature and severity of the conduct at issue does not rise to the requisite level of egregiousness to be actionable. Compare E.E.O.C. v. Central Wholesalers, Inc., 573 F.3d 167, 176 (4th Cir. 2009) (finding alleged gender-based and race-based

---

[5] The court notes, however, that an inference based on Rowell's subjective feelings is a weak one, if permissible at all. See Sunbelt Rentals, Inc., 521 F.3d at 315 (stating that a plaintiff must demonstrate that she "subjectively perceived the environment to be hostile" *and* that "the conduct was such that a *reasonable person* in the plaintiff's position would have found the environment objectively hostile or abusive") (internal quotation marks and citations omitted) (emphasis added). The record equally indicates that the problems with Rowell's performance stemmed from lack of sufficient staffing to immediately provide her with sufficient training, or from Rowell's skill level itself.



harassment was sufficiently severe or pervasive where co-workers referred to women as b* * *hes and a co-worker in a cubicle next to the plaintiff had Playboy items, watched pornography in front of her, had a pornographic screensaver, and placed a screwdriver in a Halloween decoration in a sexual manner and where co-workers used racial epithets, some directed at the plaintiff, and two co-workers "kept blue-colored mop-head dolls in their offices which they had hanging by nooses tied around the dolls' necks") and Spriggs v. Diamond Auto Glass, 242 F.3d 179 (4th Cir. 2001) (holding that supervisor's constant, even daily, use of racial epithets was sufficiently severe or pervasive to survive summary judgment) and Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1131 (4th Cir. 1995) (finding the alleged harassment was sufficiently severe or pervasive because an Iranian plaintiff was called "names like 'the local terrorist,' a 'camel jockey' and 'the Emir of Waldorf' " on an almost daily basis) with McNeal v. Montgomery Cnty., Md., 307 Fed. Appx. 766, 776 (4th Cir. 2009) (unpublished) (stating that "five accusations of theft and [the supervisor's] requirement that [the plaintiff] bring in doctor's notes and provide for more detail about his sick leave hardly rise to the level of 'hostile or abusive' treatment").

     Finally, even if the other *prima facie* elements could be established on this record, no basis exists for imputing liability for the trainers' conduct to Palmetto Health. Under controlling precedent, "[s]o long as the employer's response to each known incident of coworker harassment is reasonably prompt, and the employer takes remedial measures that are reasonably calculated to end the harassment, liability may not be imputed to the employer as a matter of law." E.E.O.C. v. Xerxes Corp., 639 F.3d 658, 675 (4th Cir. 2011). When an employer has in place and enforces an anti-harassment policy—and it is not disputed that Palmetto Health has such a policy—such may be used to show that the employer exercised reasonable care in preventing unlawful harassment. See



id. at 669. Moreover, Rowell does not dispute that when directly questioned by Knight and Sawyer about whether she believed she was being harassed, Rowell responded in the negative. (Sawyer Dep. at 79:5-18, ECF No. 23-7 at 21; Knight Dep. at 73:11-74:2, ECF No. 23-4 at 20.) Finally, Knight responded to Rowell's complaints about the water bottle incident by speaking with Stowe, resulting in Stowe's apologizing to Rowell. Based on this record, no reasonable jury could find that Palmetto Health failed to take reasonable measures to prevent known harassment against Rowell based on her national origin.

**D.     Retaliation**

Title VII's anti-retaliation section provides in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). In a typical retaliation case, a plaintiff must show that: "(1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action." Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008); Holland v. Wash. Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007). To satisfy the second element, a plaintiff must show that a reasonable employee would have found the challenged action "materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation marks & citations omitted).

For purposes of the instant motion, Palmetto Health argues that Rowell cannot show that her termination was causally connected to any protected activity. To demonstrate a causal connection,



Rowell must show that she was fired *because* she engaged in protected activity. See Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998). In certain circumstances, temporal proximity between the protected activity and the adverse action can be probative of a causal connection. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (noting that to establish a causal connection based on temporal proximity alone, the time between the employer's knowledge of the protected activity and the adverse employment action must be "very close" and holding a twenty-month period to be insufficient); Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998) ("A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two."); Pascual v. Lowe's Home Centers, Inc., 193 Fed. Appx. 229 (4th Cir. 2006) (unpublished) (*per curiam*) (holding that the plaintiff had failed to establish a causal connection by temporal proximity alone when "at least three to four months" separated the claimed protected activities and the termination of the plaintiff's employment).

Although Rowell contends that she was terminated "hours after" expressing a desire to file a formal complaint against Stowe, the record belies this assertion. First, Rowell had already expressed such a desire several weeks before to Knight, who, although she allegedly discouraged Rowell from doing so, nevertheless consulted with Sawyer, then counseled Stowe about her communication skills. Moreover, even considering that Rowell was terminated only a few weeks after expressing a desire to file a formal complaint against Stowe, Rowell cannot show on this record that she was fired because of her complaints. In support of its motion, Palmetto Health has provided abundant evidence of repeated mistakes in Rowell's performance and a failure to improve. (See

Page 17 of 20



generally Def.'s Mem. Supp. Mot. Summ. J. at 29-32 and cited exhibits, ECF No. 23-1) (detailing the problems with Rowell's performance and the steps taken). Although Rowell takes issue with the cause for those problems, she does not deny that she in fact made the mistakes for which she was counseled or disciplined. (See, e.g., Rowell Dep. at 98, 105, 166, 205-08, 228-29, 268-69, ECF No. 23-2 at 26, 28, 43, 53, 58-59, 68-69.)

For the same reasons, even if the *prima facie* elements for retaliation were met, Rowell cannot show that Palmetto Health's stated legitimate reason for terminating her was a pretext for retaliation. Again, although she lays the blame for her performance problems elsewhere, nothing in the record indicates that Knight's and Sawyer's perceptions about Rowell's performance were not genuinely held. See Holland v. Washington Homes, Inc., 487 F.3d 208, 217-18 (4th Cir. 2007) (concluding that no reasonable juror could conclude that the decision maker's reason was pretextual where the plaintiff's evidence "failed to address whether [the decision maker] did not honestly believe that the threats were made") (quoting Tinsley v. First Union Nat'l Bank, 155 F.3d 435 (4th Cir.1998)). The law is clear that it is the perception of the decision makers, not the plaintiff, that is important in the determination of whether a plaintiff can demonstrate pretext. Id. Here, no reasonable jury could find that Palmetto Health's proffered reasons of Rowell's repeated mistakes and her failure to take personal responsibility for them were not the true reasons for her termination, or that retaliation was the true reason. See Burdine, 450 U.S. at 256. The Fourth Circuit has made clear that in employment cases, notwithstanding the intricacies of proof schemes, the core of every case remains the same, necessitating resolution of the ultimate question of whether the plaintiff was the victim of an unlawful employment action. See Merritt, 601 F.3d at 294-95. Based on this record, Rowell cannot establish that she was.



**RECOMMENDATION**

For the foregoing reasons, the court recommends that Palmetto Health's motion for summary judgment (ECF No. 23) be granted.

_____
Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

August 17, 2011
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).